Good morning, Pete Ross for the appellant. I hire a tradesman to stencil on my office doors, Pete Ross, Ford Motor Company, President. The tradesman subcontracts the job. I can't sue the sub for trademark infringement. Not all agreements that involve a trademark are license agreements. So how about the agreement here? I think I have the perfect analogy. Executive recruiters. Sometimes we hire them to fill a position for us. Sometimes they just call out of the blue. I have someone to fill the opening you have for a plant manager. And we can't sue them for trademark infringement just because they used our trade name to solicit candidates. If you enter into an agreement with the candidate, the recruiter gets paid. If not, he or she doesn't get paid. In this case, me Renee acted as an executive recruiter. Nothing in the agreement at all authorized LHG to use the Elite trademarks. Not unless or until a further contract was signed accepting a candidate. It's not a trademark license. The marks aren't even described in the agreement. No copies of the marks are attached. No references are made to their registrations. In my view, no approval was required for the assignment of that contract. Next issue. Is there a triable issue of fact about whether Elite has stopped or waived its rights? In my view, the answer is yes. The primary issue raised by Elite is whether they knew of the assignment. In my view, the evidence is sufficient to create a triable issue about whether they knew. First, we have the June 2010 e-mail from Renee Esabag where she says. Let me ask you this question. Is this true regardless of whether or not you went on the first issue? In other words, if you're right that it's not a trademark license, but an assignment or some sort of another contract, do we then still say it's got to go back for a trial on these issues? If we win on that issue, then I think we can proceed to a jury. If we don't win on the trademark license issue, if this Court were to find it is a license agreement. That's what you're now talking about, that there are a lot of issues with respect to consent and waiver. Yes. Factual issues. Yes. And I refer to two e-mails in particular. One is the one sent by Renee Esabag in June of 2010 which says, and I quote, I did speak to Jimmy and I got authorization to sell schools, but I'm still working on getting a signed contract with him transferring me those rights. Now, to analyze that for a moment, from indulging in all inferences in my favor, an assignment doesn't have to be in writing. In interpreting that in our favor, Renee Esabag is saying she already has been assigned the rights, arguably, and she's simply working on getting the assignment confirmed in a written contract. Then we have the response from a lead, Paul Johnston, not to that e-mail, but to a different e-mail where he says, and I quote, So it is clear that the MeRenee LLC is acting as the master licensor, pursuant to a license from Elite World. Please make that revision. So putting those together, it sure sounds as if he got the message that MeRenee was the assinee of the license. And he's not objecting. And that's an estoppel. He's not objecting where he should have. And he's an attorney. He's their general counsel. In my view, that's a waiver. Was it a waiver or estoppel? They're different. Well, I think it could be both. A waiver is a waiver of a known right. Known right. So he's an attorney, and he seems to understand that there's an assignment. What's the estoppel from denying? That they approved the assignment to MeRenee. So my argument there is they knew of the assignment based on these two e-mails, and they allowed MeRenee to go out and perform for several years without saying anything about it. That would amount to an estoppel. They allowed us to change our position to our detriment. Spent a lot of time and effort. The waiver is because he's an attorney, he knows his rights, and he doesn't assume. In your view, there's at least a tribal issue of fact over consent and knowledge. Yes. So, again, if we agree with you, do we have to decide whether it was an estoppel or a waiver, or do we just have to decide that there's a tribal issue of fact over knowledge and consent and let the district court decide what legal principles apply to those facts if developed? I would say the latter. Finally, I have the fraud theory. Our theory is simple, that Elite never intended to honor the settlement agreement with LHG. All rights under that agreement were assigned to MeRenee, including the fraud cause of action. That assignment of a claim didn't require anybody's approval. On the fraud claim, right, Judge Reel dismissed that under Rule 9. Yes, he did. Now, did you ask him for an opportunity to amend? Yes, we did. You think you can amend the fraud allegations? Yes. To be specific? Yeah. What Judge Reel said specifically was the lack of specificity with respect to the time, place, and identity of the speaker of the allegedly fraudulent representatives is fatal to this cause of action. But we can allege that. We can allege the time, place, and the identity of the speaker. He was concerned that you'd already had two prior, you had the original complaint and then an amended complaint. Yes, he was. You didn't, you know, Rule 9 is the lawyer who's alleging a fraud claim in federal court and should know about Rule 9. We filed this in state court. It was removed to the federal court. Before it was removed to the federal court, we amended once as a matter of right to add two parties. So no one had answered, and we just added two parties. No one had challenged the fraud claim. No one had said it lacked specifications. We weren't amending to enhance the specification. The first time it was challenged was in front of Judge Reel, and he said, well, you haven't alleged the time, place, and manner or the speaker's identity, and you can't amend because you amended in the state court just to add two parties. To me, that's the— Where did he say you haven't alleged time, place, and manner? If I'm reading his opinion correctly, in the very last paragraph, he says, an amendment with respect to the parties who are being dismissed for lack of personal jurisdiction would be futile. The same is true with respect to claim for breach of implied covenant in good faith. Then he goes on. With respect to the claim for fraud, me, Renee, has had two opportunities to plead specific facts sufficient to state a claim for fraud and failed to do so. Leave to amend, therefore, is denied. He said nothing about time, place, or anything else. He just said you had two bites at the apple, and you didn't amend, and you didn't state a fraud claim. And you say, yeah, we had two bites at the apple, but that was in state court when we added parties before an answer was even filed, and we didn't have to allege with particularity, and he didn't give us a chance to do it, and he never explained his reasons. That's correct, and the reference to the record I was looking at was one appellant's excerpts of the records, or one excerpt of the records at 28, and I think that's a proper cite to his reason. Under Rule 9, when you talk about specificity, you think of it in terms as you just suggested, time, place, speaker. Yes, and we can do that. We're alleging the fraudulent representations were made at a meeting where certain people were present, and they reached an agreement, and we would ask for the opportunity that I think was wrongfully denied to us to amend. Why don't you save the balance for rebuttal? Thank you. Good morning, Your Honors. Matt Kaplan for the appellees, and as you can imagine, this is going to sound a little different coming from me. There's more than these two e-mails from June 2010 and March 2012 to this case. They're undisputed facts that relate to the correspondence between the parties for a period of two years and Ms. Essebag's deposition testimony in this case. And when you look at that in the totality of circumstances, the picture emerges that it was Ms. Essebag, the original parties to the new license agreement, through LHG, Mr. Essebag, and Mr. Bertranew, and their counsel trying to conceal the fact that they tried to assign this trademark license. And we begin in May of 2012. There are e-mails from Ms. Essebag claiming that she is representing LHG with respect to the new license agreement, and those e-mails begin at page 331 of the record. There's follow-up again, May 2011, where she's making the same representations. Eventually, Mr. Ross gets involved, and he sends letters to LHG on behalf of LHG in 2011, July and September, telling LHG that he's representing LHG with respect to the new license agreement. Mr. Essebag, in October 2011, corresponds with LHG, claiming it is on behalf of LHG, and this is a year after the license was purportedly exchanged with Miwodne. No one at that point had told Elite that there was any purported exchange of the license. And this goes on. It's even with proposed sub-licensees. Ms. Essebag is telling them that she's representing LHG on behalf of Elite. You can see that at page 191 of the record, or excuse me, 356, and she refers to LHG as our company in an e-mail on page 191 of the record. It's not until Ms. Essebag's e-mail in October 2012, after the proposed sub-licensees have been rejected, that frustrations bubble over, and for the first time she explicitly tells anyone at Elite that she believes the license agreement has been assigned. This is consistent with her deposition testimony in this case. We asked her if she ever sent copies of either one of the two purported assignment agreements to Elite. She said she didn't send copies, but she didn't say, I never told anyone. There's a follow-up. We asked her if she ever called anyone at Elite and told them that there was an assignment, and her response to that question was no. And that appears, I think, on page 309 to 311 of the record. We have the excerpts of her deposition testimony. So we have a course of conduct of two years in which Ms. Essebag is purporting not just to Elite, but to the world that she's representing LHG, the party that Elite thought it was dealing with from the time they entered into the new license agreement in 2009. And I do believe that is a trademark license. The test to determine if an agreement is a trademark license in the Ninth Circuit involves two things. One, the right to use a mark, and two, retaining quality control over the mark by the owner of the trademark. And I think we have both of those here. If we look at section D1 of the new license agreement, and that's on page 327 of the record, LHG is granted the right to act as the master licensee of the trademarks registered by Elite Licensing. What does that mean? It means that LHG is allowed to use the marks in order to find people to open fashion academies. And there's a difference between the scenario that Mr. Ross mentioned during his argument. If you look at the preceding section in the new license agreement, section D2, it talks about sort of the finder's fee, the type of idea where you would have a recruiter, someone going out and finding potential licensees for other Elite products. Where does it say that? So on page 327 of the record, it's the non-exclusive broker's agreement in section C, which is the section of the settlement agreement immediately prior to the new license agreement. But that's not part of the new license agreement. Correct. The new license agreement is the following section, right? Yes, that's right. But the scenario Mr. Ross had mentioned where you would have a finder's fee or a recruiter is more like what's laid out in section C here. And I think the fact that you have section C, that's sort of the finder's fee or the recruiter, and then there's a difference in the language when you get to section D, and it's dealing with the trademark license explicitly for fashion academies. And the idea is that LHG would be able to use Elite's trademarks, you know, in order to find sub-licensees to actually operate the fashion academies. So LHG wouldn't be operating the fashion academies themselves, but they would use the marks and exploit the marks in order to build a brand of fashion academies and build essentially schools around the world if they found appropriate sub-licensees. How do they use the trademark when they approach people? I mean, they say, I've got an agreement with Elite and want to talk to you about opening fashion academies to use their name. Is that the use of the trademark or kind of a discussion? That's part of it. You would be using the marks in conjunction with finding the sub-licensees, showing them how you could run a fashion academy, and having the marks involved in the marketing for the fashion academies as well. And they would necessarily have to use some of the marks to do that in terms of marketing the opportunity and working with the sub-licensees. But neither they nor the sub-licensees could actually, you know, use the mark by, say, putting it up on a storefront saying, I'm a fashion academy affiliated with Elite until you all approve the new people. Yes, Elite would still need to approve the use for a particular fashion academy. And I think that's consistent with the purpose of a trademark license, which requires the mark owner to maintain quality control of the mark and ensure and maintain the brand's goodwill. So when someone would go to one of these fashion academies, it met the standards of Elite. And that's one of the core principles behind trademark licenses. The actual owner of the license can't give up that control. They have to maintain. But you're not giving up any control until LHG or me, Rene, comes back to you and says, I've identified these people who want to create a fashion academy and use your mark and be part of your network, and here's the proposal. What do you think? And if you say no, those new people aren't using your mark for any purpose. So LHG could use the marks in that interim step in order to market and attract the sublicensees. You're correct that the sublicensee could not use the mark without permission. But in between Elite and the proposed sublicensees, LHG was free to use the marks in order to find the sublicensees to actually own and operate the fashion academies. So what does use or exploit a trademark mean in terms of a term of art? Those words are not used in the new license agreement. They're used elsewhere in the settlement agreement. Yeah. So in the recitals of the settlement agreement, they reference the prior license agreement, and that is where the exploit language comes in. And the new license agreement is essentially the new version of that previous agreement. The new license agreement is part of a broader settlement agreement that was reached after LHG, Mr. Essobag, and one of their other companies, ULG, had sued the Elite entity. But is it enough to use or exploit a trademark by saying to someone or even writing a letter to someone saying, I have this agreement with Elite and I'm trying to find people to open fashion academies who could then use the Elite reputation and trademark and whatever? Is that enough to constitute a use of a trademark? I think it depends on the circumstances. The import here of the new license agreement is it's actually giving them explicit permission to do just that. And then if there aren't any other questions about the trademark license, the next issue is Well, I'm still having a problem with the language of the new license agreement and how it gives them permission to do just that. So in section D1, which is the new license agreement on page 327 of the record, Elite Licensing is granting LHG the right to act as the master licensee of the trademarks registered by Elite Licensing for the purposes of finding the sub-licensees for the fashion academies. So I think the step there is they're giving, whether or not they actually do, they have permission to use the marks in terms of marketing the proposed sub-licensees. And we see there are examples of LHG and Ms. Esabag doing that when they have reached out to some of the proposed sub-licensees. One example is some of the proposed licensing language that Ms. Esabag sent to some of the proposed licensees where it makes findings or makes statements about LHG or me, Renee's right to use the Elite trademarks for these purposes. And one of those draft agreements begins on page, I think, 212 through 227 of the record. And another example are in some of her emails with the proposed sub-licensees. An example of that, which I mentioned earlier, comes from November of 2011. And that's on page 356 of the record. And she talks about her ability and rights to find the sub-licensees, including the rights to use the trademarks for these purposes. So let me just, I just have one question for you on this. Yes. When is it your position that your client or that Johnson learned that there had been an assignment, a purported assignment? Yeah. So the first time anyone explicitly told anybody at Elite that me, Renee, believed the rights were assigned were the October 2012 letter that she sent to Paul Johnson. Mr. Ross mentioned an earlier email that year from February or March of 2012. And if we look at the entirety of that email, and it begins on page 235 of the record, it's a two-page email from Mr. Johnson. And the text of the email, there's five or six references to Mr. Johnson referring to LHG as the contracting party, LHG as the licensee. Mr. Esabag, the original principal of LHG, is copied on that email. LHG's counsel, Mr. Ross, was copied on that email. And there's a stray paragraph in which Mr. Johnson is editing a proposed agreement that was sent to him. And that's where the me, Renee language comes in. But in all of these other emails, at the actual text of the email, not just the one from 2012, but there's other ones, there's consistent references to LHG being the contracting party and the master licensee of the Elite trademarks for the fashion academies. So is the point that before, what happened when you learned about the assignment? Did you break off relations? Yes. So all of this earlier stuff is you were saying that you all were relying on the fact that you're still dealing with LHG up through October of 2012. Yes. So Elite believed they were dealing with LHG. Ms. Esabag's emails that I pointed out earlier consistently referenced that she was working on behalf of LHG. There was correspondence from counsel referencing that he was working on behalf of LHG. There was correspondence from Mr. Esabag purporting to be from LHG. And this is all for a period of up to two years after the new license agreement was purportedly assigned. And so the issue of knowledge and consent doesn't really arise until the affirmative representation in October 2012, when Ms. Esabag told Mr. Johnson that she believed she had an ownership interest in the new license agreement. And that's consistent with her deposition testimony and the actual text, I think, of all of the previous emails in which there are representations that she was working on behalf of LHG. And so that's really for the waiver and the stop-law arguments that me, Renee, is advancing here. You have to have that factual predicate that there was knowledge of the true state of affairs. And there wasn't knowledge of the purported assignment until October 2012. And at that point, there were no more proposed sub-licensees, and the relationship with the parties was effectively done until this lawsuit was filed. Now, lastly, as my time is running out, I want to quickly address the leave to amend point. There's, I think, three separate and independent reasons why that decision can be upheld by this court. The first is if you agree on the fact that the assignment needed to be approved by elite, there's no harm in denying leave to amend because you wouldn't have standing to assert the fraud claim without a valid assignment. Secondly, there were two prior amendments. And lastly, one of the requirements that was included in the Bonin case by this court is- Which case? Bonin, B-O-N-I-N, cited in our brief. The party seeking leave to amend has to explain to either this court or the district court the actual changes to the allegations they would make in order to be able to state a fraud claim under 9B. And they didn't do that in the motion to dismiss briefing, and they didn't do that in their appellate briefs here. Unless you have any further questions, thank you very much for your time. Okay, thank you. Could you maybe start by addressing his last point, that you did not- The prior amendments have nothing to do with 9B. But he also makes the point that in the motion to dismiss arguments in briefing, you failed to tell Judge Rayl what you would do if he gave you leave to amend. Well, the briefing, at the time of the briefing, we actually thought we met all the requirements and we weren't sure what ground there would be. You mean you thought the complaint before the district court was adequate? I did think that, because we identified who, earlier in the complaint, who was at the meetings. And so, the representatives of Elite were there, and it was Bernard Henné doing the talking. So, we thought there was sufficient information in there. When did you learn that either your opponents or the judge may have had a different view? I presume at the hearing that day, because Judge Rayl's practice is to have his order written out, and he reads it. Was there an oral argument, or did he just, before he read his order? He has the oral argument before he reads his order. It was very quick. At that hearing, did you ask for leave to amend? We asked in our papers, and I'm not sure that I added anything to it. Other than, we'd like leave to amend. Yes. What's your response to your opponent's comment that if we agree that this is a trademark license agreement, that me, Renee, doesn't have standing to pursue a fraud claim over the settlement agreement? She would, because she got an assignment of all ALHG's rights. She got an assignment of the settlement agreement? Yeah. The license agreement is in the settlement agreement. She was assigned everything, including these claims, in our view, and the assignment of claims doesn't have to be approved by anybody, and we were free to pursue the fraud claim on behalf of the LHG as the assignee under that agreement. Just a couple other points that occurred to me while I was listening to opposing counsel. He said with regard to their knowledge of the assignment, if you looked at the totality of these circumstances, you could conclude that they didn't have knowledge of the assignment, but our response is that's not the standard on summary judgment. We think we have credible evidence that they did know, including the 2010 email where she's saying to Bernard Hene. You could say, the district court could say, even though there's competing evidence, it's so de minimis that no trier of fat could ever agree with your position. Yeah, and I don't think that's the case here, where you have an email where she's saying I've gotten permission to sell the schools, and I'm looking to cement the transfer of rights with a written agreement, and combined with Paul Johnston's email later saying make sure it's expressed that me, Renee, is the licensee. I think a reasonable juror could conclude, based on that evidence, that they knew of an assignment. And so the last point is picking up on what Judge Friedman said. How did they use the trademark? And I think that's the key. It's not an infringing use. We were using it, just like an recruiter. We're looking for people who want to operate elite fashion academies, will propose you to elite, and unless and until there's a further written agreement signed, there is no license that anybody has, and there's no right that anybody has to use the mark in a trademark sense. Thank you very much. Okay, thank you. We appreciate your arguments, counsel, on the matter submitted.
judges: Tashima, Paez, Friedman